## WILLIAMS v. McNALLY, ET AL.
(No. 1456; September 25, 1928; 270 Pac. 411)

*H. Glenn Kinsley,* for appellant.

132

*C. A. Kutcher,* for respondents.

KIMBALL, Justice.

W. G. Williams, the plaintiff and appellant, describes himself as a mechanical and petroleum engineer and an expert in the transportation and refining of oil. The Wyoming North and South Railroad Company, incorporated January 29, 1923, and the North and South Railway Company, incorporated April 20, 1923, are Wyoming corporations which, on July 31, 1924, passed into the hands of receivers. The receivers first appointed were succeeded by R. E. McNally, the present receiver of both corporations, and defendant and respondent in this action. The action was brought by the plaintiff against the receiver to recover some $65,600, of which $40,000 was claimed as compensation for services rendered as engineer and promoter of the two named corporations, and $25,600 for expenses incurred in performing those services. The claim for "services," or reasonable compensation, was abandoned at the beginning of the trial, and the question tried was plaintiff's right to reimbursement for the claimed expenses. Of the amount which in the petition was claimed on account of expenses, the plaintiff at the trial admitted the payment of about

$7500, leaving a claimed balance of about $18,100. The District Court, after a trial without a jury, found against the plaintiff who appeals, contending that the judgment is not sustained by sufficient evidence and is contrary to law.

From the plaintiff's testimony it appears that, for about a year beginning in November, 1921, he and two associates, Staley and W. A. Williams, for themselves and on their own initiative occupied themselves in an investigation of the oil production and the facilities for the transportation of oil from the Salt Creek Oil field near Casper in this state. They had in view a plan for the purchase of oil produced from that field, and the transportation thereof by a pipe line to connect with the Chicago, Milwaukee & St. Paul Railroad Company at some point in Montana. The principal specific matters they sought to accomplish were to induce the government to sell at public auction its royalty oil, to obtain authority to construct an interstate pipe line, to procure capital for the construction of the pipe line, and to induce the Chicago, Milwaukee & St. Paul Railroad Company to enter into a contract for a favorable division of freight rates on oil transported through the pipe line to the railroad, and by the railroad to market. During this period, the plan of the plaintiff and his associates did not include the construction of a railroad from Salt Creek. Indeed, plaintiff says that he then saw no chance of any one putting up money for a railroad. He did think, however, that his investigations and preliminary work showed the feasibility of, and cleared the way for, the procuring of oil and the construction of the pipe line.

In November, 1922, plaintiff met C. N. Haskell, who it seems was then in control of the Middle States Oil Corporation and its subsidiary companies. The plan of plaintiff and his associates being explained to Haskell, the latter became interested, and it was he that then first suggested a railroad instead of a pipe line. November 27, 1922, a writing was signed by plaintiff, his associates and Haskell, which reads as follows:

"Nov. 27, 1922.

"Messrs. R. K. Staley,
      W. A. Williams and
      W. G. Williams,
"Gentlemen:—

"Preliminary to a definite contract, we are interested in the general information and statistical work that you bring to our attention concerning Wyoming and Montana from an oil producing, transporting and marketing standpoint, and contemplate interesting ourselves therein to the end that we may jointly co-operate in constructing and operating transportation facilities, whether pipe line or railroad, and manufacturing and marketing facilities for oil product of one or both of these States. The present plan seems to favor the building of a railroad as a trunk line transportation and to supplement the same by radiating pipe lines or gathering systems with storage and other necessary appurtenances, and at that points that may be desirable, to erect skimming or refinery plants, or dealing with such plants operated by others, to the end that we may combine our efforts for the general purposes above outlined.

"It would be understood that any acquisitions by either of us from this date, in the way of oil production or royalties on leases or the creation of transportation or manufacturing facilities, that the combination so formed between you and us should have the first call on any thereof; that such enterprises as it may be mutually determined to construct or acquire, that we undertake the financing thereof with the securities necessary for providing such capital to be issued upon different of said properties provided for from time to time, and that of the Common Stock Fifty-one per cent (51%) should be allowed with securities, in which event all such securities would provide net cash of not less than Ninety Cents (90c) on the Dollar, whether they be pipe line, refinery or railroad securities, and that the Forty-nine percent (49%) of whatever stock might be determined upon on any of said properties jointly or separately incorporated, should be decided as the compensation to you gentlemen and ourselves for our efforts and connection therewith, which Forty-nine per cent (49%) would at all times be divided, one-third to yourselves and two-thirds to our party, and that allotment on this basis would be made from time to time on each property completed or capitalized, whether it be pipe line, refinery or railroad.

"It is also understood that your expenses at all times while engaged on behalf of any of said enterprises should be paid by us and considered as a constructive item.

"The above mutual efforts and division of results or profits is to apply to all of the things incident to any of the enterprises mentioned which incidents would include townsites on railroads, or profits on agricultural or mineral land of any kind or character."

(Signed)    "C. N. Haskell<br>R. K. Staley<br>W. A. Williams<br>W. G. Williams."

The plaintiff testified that all the expenses in question that were incurred after the signing of the foregoing writing were in connection with work under the direction of Haskell to carry out the purposes mentioned in the writing. As appears from the writing and other evidence in the case the development of the oil industry was the primary object. The scheme contemplated the acquisition of oil, oil lands, leases and royalties; the building of refineries, pipe lines and railroads, and the promotion of townsites. To carry out these purposes various corporations were organized under the direction of Haskell. Among these, were a pipe line company and a townsite company. It was probably intended that the business of producing and refining oil should be in the hands of the Middle States Oil Corporation or some other of the oil companies of which Haskell was supposed to be the controlling force. There were three railroad companies. The Wyoming North & South Railroad Company was organized for the purpose of constructing an intrastate railroad in Wyoming, and the Montana Railway Company for the purpose of constructing an intrastate railroad in Montana. The North & South Railway Company is described as a holding company for the two others. Another company, the Reliable Securities Corporation, seems to have acted as disbursing agent. It was intended that the various new corporations would be financed by the Middle States Oil Company.

The line of railroad which Haskell undertook to finance and construct as a part of the enterprise or enterprises mentioned in the writing of November 27, 1922, was intended to extend from a point near Casper on the line of Chicago & Northwestern Railroad Company, through the Salt Creek Oil fields to Miles City, Montana, on the line of the Chicago, Milwaukee & St. Paul Railroad Company. The only part completed was the south 40 miles, from Salt Creek to the line of Chicago & Northwestern Railroad.

The plaintiff produced at the trial his statement of account showing the amount of the expenses which he sought to recover from the receiver. There was no attempt either in the statement or in plaintiff's testimony to itemize the charges, but they were divided into six classes: Railroad, Hotel, Meals, Tel. & Tel., Miscellaneous, and Auto & Genl., showing the totals for each month during the two-year period November, 1921 to December, 1923. The totals for the full period were approximately: Railroad, $3500; Hotel, $7400; Meals, $5400; Tel. & Tel., $1000; Miscellaneous, $8000; Auto & Genl., $600. The statement of account shows that about $13,000 of plaintiff's expenses were in connection with the preliminary investigations and work from November, 1921, to November, 1922, as mentioned above. About $2600 was for expenses after the writing of November 27, 1922, and before the organization of either of the Wyoming railroad corporations. The remainder, about $10,000, was for expenses from the time of the organization of the Wyoming North & South Railroad Company until December 1, 1923.

We may say at the outset that it seems doubtful whether the record shows any contract, even by Haskell, for the payment of plaintiff's expenses incurred prior to the signing of the writing of November 27, 1922. That writing apparently speaks prospectively, and when Haskell promised ''that your expenses at all times while engaged on behalf of any of said enterprises should be paid by us (Haskell) and considered as a constructive item,'' he was

evidently referring to future expenses incident to the promotion of the enterprises mentioned. But if we are wrong in this conclusion, the plaintiff's right to recover from the receiver his expenses before November 27, 1922 would have to be denied for the reasons that cause us to hold, under the evidence in the record, that he was not entitled to recover anything.

The writing of November 27, 1922, was an agreement among promoters. Haskell in promising to pay plaintiff's expenses had no authority to bind any corporation not then organized. If the expenses were incurred in some work of which the corporations had the benefit, we may assume that the plaintiff would be entitled to recover from the receiver on proof of an express promise by the corporation to pay them, or on proof of facts from which a promise to pay might be inferred.

The plaintiff in his petition alleged that the railroad companies expressly agreed to reimburse him for his expenses "incurred by him in connection with his promotion of said railroad proposition," but we find no evidence to support the allegation. In the argument, it is apparently conceded that no one except Haskell made any such express agreement, but it is claimed that Haskell had implied authority to bind the corporations. If it were a vital point in the case, we would be far from conceding that the evidence shows that Haskell had any authority to make such a contract for the railroad corporations. If, for the purposes of this case, we assume that he did, plaintiff is still lacking in his proof, for there is no evidence that required the trial court to find that Haskell, after the organization of the railroad companies, ever promised on behalf of the companies that plaintiff's expenses would be paid by them or either of them. It is true that plaintiff on his direct examination testified that the railroad companies after they were incorporated assumed or agreed to pay his expenses including expenses prior to November, 1922; but this testimony by his other testimony is explained thus:

"Q. After the companies were incorporated were there any other arrangements made?

A. He (referring to Haskell) told me that he would take care of any past expenses which amounted to about fifteen thousand dollars at that time. * * *

Q. Mr. Williams, when you say these defendant companies assumed this expense account, what do you mean by that?

A. I mean they assumed it.

Q. Mr. Haskell promised to pay it. Isn't that the situation?

A. Yes, sir."

The trial court was warranted in finding that any promise by Haskell was intended to bind only him personally.

The plaintiff claims, however, that the defendant is liable because the railroad companies accepted the benefits of plaintiff's work. It is true that there are cases holding that a corporation may become liable for reasonable expenses incurred in work necessary to its organization (West Point T. & T. Co. v. Rose, 76 Miss. 61, 23 So. 629; Ramsey v. Brooke Co. B. & L. Ass'n., 102 W. Va. 119, 135 S. E. 249) and that in some circumstances a corporation accepting the benefits of a promoter's contract with knowledge of the contract, must also assume the burdens. (Cook, Corp. (8 Ed.) Sec. 707). But none of the reasons for holding the corporation liable seem at all applicable to the facts of this case. None of the claimed expenses were incurred in work necessary in the organization of the corporations, and the corporations have received no direct, tangible benefits from plaintiff's work. As already indicated, plaintiff's statement of his expenses was very general. Many of the items were shown by his cross-examination to be unreasonable in amount. There is nothing in the evidence to show how great an expense was incurred in any particular work. No vouchers were produced. According to plaintiff's testimony, if he last night had a hundred dollars in his pocket and to-night had five dollars, his expenses for the day were ninety-five dollars; and, apparently, two years expenses,

so determined, were charged against the railroad companies of which the defendant is receiver, although it is clear that most of plaintiff's time was devoted to the promotion of enterprises with which those railroad companies had little or no concern. The nature of his work before November, 1922, has already been shown. From his indefinite recital of his activities for the period from November, 1922, until about May 1, 1923, we gather that for practically all of that time he made his headquarters at Miles City, Montana, where he was occupied in promotion and preliminary work on behalf of the Montana Railway Company with which the defendant receiver has nothing to do. About May 1, 1923, plaintiff went to Colorado, and thereafter was never occupied in any work either in Montana or Wyoming. In Colorado from May 1, to December 1, 1923, he was attempting to promote a railroad in that state which could have had only a very remote connection with the railroad in northern Wyoming. He evidently attaches much importance to his work in inducing the department of the interior to sell at auction the federal royalty oil, and in attempting to procure from the state a lease of a valuable section of land in the Salt Creek field. We are not sure what company or companies were intended to receive the direct benefit of such work, but certainly not the railroad corporations represented by the defendant. There is no authority that would authorize the finding of an implied promise by the railroad companies to pay expenses incurred in the promotion or for the benefit of other companies merely because the success of the latter might have resulted in creating freight business for the former.

The plaintiff testified that he spent some time in obtaining an agreement with the Chicago, Milwaukee & St. Paul Railroad Company for the division of rates on freight brought to that road by the Wyoming North & South Railroad Company and the Montana Railway Company, and that he spent a few days in inducing the people of Sheridan and Buffalo, Wyoming, to promise to give bonuses and

rights of way for the benefit of the proposed railroad in Wyoming. From these last mentioned services the Wyoming railroad companies might have received some direct benefit, if the road had been constructed as planned. But the railroad not having been constructed, the companies, of course, have had no benefit from the rate contract, and have not received the bonuses or the rights of way. Further, the trial judge had no way of finding from the evidence the amount of the plaintiff's expenses in these matters, and a judgment for plaintiff in any amount would have been the result of a mere guess. If it could be conceded that the railroad companies became legally liable to pay plaintiff's expenses incurred in work intended to benefit those companies, we cannot say that the admitted payments, $7500, were not more than sufficient to discharge the liability. See, Carter & Co. v. Coston, 9 Ga. App. 493, 71 S. E. 764.

The judgment for defendant will be affirmed.

BLUME, Ch. J., and RINER, J., concur.